JONATHAN WASDEN
Wasden Banias LLC

BRADLEY B. BANIAS
Wasden Banias LLC

GEOFFREY FORNEY
NJ Attorney No. 036232006
Wasden Banias LLC
411 West Ellet Street
Philadelphia, PA 19119
202-615-8315/ geoff@wasdenbanias.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### Trenton Vicinage

| | |
|---|---|
| ITSERVE ALLIANCE, INC.,<br>DOTS TECHNOLOGIES, INC.,<br>IFLOWSOFT SOLUTIONS, INC.,<br>KOLLA SOFT INC.,<br>NAM INFO, INC.,<br>PRECISION TECHNOLOGIES CORP.,<br>SMART WORKS, LLC, and<br>ZENITH SERVICES, INC.,<br><br>                Plaintiffs,<br><br>          v.<br><br>EUGENE SCALIA, UNITED STATES<br>SECRETARY OF LABOR, and<br>JOHN PALLASCH, ASSISTANT<br>SECRETARY OF LABOR,<br><br>                Defendants. | CIVIL NO.: 3:20-14604 |

# COMPLAINT

Plaintiffs in this civil action are United States information technology and computer servicing companies that employ United States workers and H-1B skilled non-immigrant workers in computer occupations in New Jersey and in other parts of the United States.  Plaintiffs rely on skilled computer professionals, including those they employ through the H-1B temporary worker program, to service the information technology needs of their clients in New Jersey and in other parts of the United States.  Plaintiffs have participated in the H-1B program for many years by filing Labor Condition Applications with the Department of Labor and obtaining approved H-1B petitions for their non-immigrant workers from the Department of Homeland Security.

Plaintiffs pay the higher of the actual or prevailing wage rates to their skilled foreign workers and they comply with the wage obligations set by the Department of Labor in the H-1B program.  For many years, the Department of Labor set the prevailing wage rates in the H-1B program based on a published formula on which Plaintiffs relied in calculating their costs and in setting their billing rates for their clients.  However, on October 8, 2020, without providing prior notice and without affording Plaintiffs or the general public an opportunity to comment, the Department of Labor dramatically altered the manner in which it calculates prevailing wage rates for the H-1B program.  Despite increasing the prevailing

wage rates by as much as twenty-four to fifty percent or more for the computer occupations in which Plaintiffs typically employ H-1B workers, the Department of Labor made those exponentially higher wage rates effective immediately on October 8, 2020, without prior notice or opportunity for Plaintiffs to submit information and data regarding the basis or soundness of the new wage rule.

Plaintiffs bring this civil action challenging the Department of Labor's decision to set dramatically higher wage rates without following the notice and comment rulemaking procedures required under the Administrative Procedure Act. Plaintiffs also challenge the agency's new wage rates as a violation of the Immigration and Nationality Act, as amended, because the new wage rates are set under a novel standard that conflicts with the governing statutory criteria. The Department of Labor's new wage rule is also arbitrary and capricious because the agency relied on outdated, incorrect, or limited empirical data, failed to consider readily available, relevant data and empirical studies, and engaged in reasoning that conflicts with basic economic theory. Plaintiffs seek a preliminary and permanent injunction to stop the Department of Labor from imposing arbitrary prevailing wage rates that will upend Plaintiffs' businesses.

## PARTIES

1.    Plaintiff ITServe Alliance, Inc. ("ITServe") is a nonprofit corporation under Texas law with its principal place of business in Dallas, Texas. Its members

comprise more than 1,250 information technology companies throughout the United States, including member companies located in New Jersey. The named Plaintiffs below are members of ITServe that are organized under the laws of New Jersey or have places of business in New Jersey.

2.     Plaintiff Dots Technologies, Inc. ("Dots") is a corporation organized under the laws of New Jersey with its principal place of business in Piscataway, New Jersey.

3.     Plaintiff Iflowsoft Solutions Inc. ("Iflow") is a corporation organized under the laws of New Jersey with its principal place of business in Iselin, New Jersey.

4.     Plaintiff Kolla Soft Inc. ("Kolla Soft") is corporation organized under the laws of Arizona with an office located in Middlesex, New Jersey.

5.     Plaintiff NAM Info, Inc. ("NAM") is a corporation organized under the laws of New Jersey with its principal place of business in Cranbury, New Jersey.

6.     Plaintiff Precision Technologies Corporation ("Precision") is a corporation organized under the laws of New Jersey with its principal place of business in Monmouth Junction, New Jersey.

7.     Plaintiff Smart Works, LLC ("Smart Works") is a limited liability company organized under the laws of New Jersey with its principal place of business in Edison, New Jersey.

8.      Plaintiff Zenith Services, Inc. ("Zenith") is a corporation organized under the laws of New Jersey with its principal place of business in Princeton, New Jersey.

9.      Defendant Eugene Scalia is the Secretary of Labor for the United States Department of Labor.  In that capacity, he is charged with the management and administration of the Department of Labor, including the formulation, implementation, and enforcement of its policies under the Immigration and Nationality Act, as amended.  Secretary Scalia maintains his principal office in Washington, D.C.  Secretary Scalia is sued in his official capacity.

10.     Defendant John Pallasch is the Assistant Secretary of Labor for the Employment and Training Administration.  In that capacity, he is charged with the management and administration of the Employment and Training Administration, which is responsible for overseeing the Office of Foreign Labor Certification and the H-1B program.  Assistant Secretary Pallasch approved and signed the Department of Labor's new interim final rule setting prevailing wage rates in the H-1B program, 85 Fed. Reg. 63872, which went into immediate effect on October 8, 2020 without prior notice and opportunity for public comment.  Assistant Secretary Pallasch maintains his principal office in Washington, D.C.  Assistant Secretary Pallasch is sued in his official capacity.

**JURISDICTION AND VENUE**

11.    This Court has subject matter jurisdiction over this case pursuant to 28

U.S.C. § 1331. *Califano v. Sanders*, 430 U.S. 99, 106 (1977).

12.    Under federal question jurisdiction, this Court may hear claims under the

Administrative Procedure Act ("APA") challenging final agency actions.  5 U.S.C.

§§ 702, 704.

13.    Under the APA, this Court may set aside agency actions that are arbitrary

and capricious or not in accordance with law.  5 U.S.C. § 706(2)(A).

14.    Under the APA, this Court may set aside agency actions that are contrary to

procedure required by law.  5 U.S.C. § 706(2)(D).

15.    Under federal question jurisdiction, this Court may also provide declaratory

relief under 5 U.S.C. § 703 and 28 U.S.C. § 2201.

16.    Venue is proper in the District of New Jersey under 28 U.S.C.

§1391(e)(1)(C) because Plaintiffs Smart Works, NAM, Precision, Dots, Zenith,

and Iflow are organized under the laws of New Jersey and maintain offices in this

district.

**STANDING**

17.    ITServe is a trade association, organized to meet the requirements of

§ 501(c)(6) of the Internal Revenue Code.  The Department of Labor's new interim

final rule governing prevailing wage rates in the H-1B program impacts all of

ITServe's members because those members employ foreign nationals in H-1B non-immigrant status under 8 U.S.C. § 1101(a)(15)(H)(1)(b).

18.    ITServe has trade association standing to bring claims on behalf of its members because each of those members have standing to sue in their own right, it seeks to protect its members' interests germane to the organization's purpose, and the claims asserted in this civil action do not require the participation of the individual members.  *See, e.g., N.J. Coal. of Auto. Retailers, Inc. v. Mazda Motor of Am., Inc.*, 957 F.3d 390, 392 (3d Cir. 2020).

19.    Individual ITServe members have standing to bring this suit because the Department of Labor's interim final rule violates the APA and the Immigration and Nationality Act, as amended.  The interim final rule will also harm all member companies because they employ H-1B workers and will be required to pay significantly higher wage rates to H-1B workers under the interim final rule.

20.    An order enjoining the Department of Labor's interim final rule, either preliminarily or permanently, is germane to ITServe's mission because the association seeks to protect the interests of its member information technology providers and computer consulting companies.

21.    Although individual member companies are participating in this suit as named Plaintiffs, their participation is not required because ITServe may properly challenge and seek to enjoin the Department of Labor's interim final rule.

## LEGAL BACKGROUND

22.    The Immigration and Nationality Act, as amended ("INA") provides for the admission of temporary, skilled workers in H-1B classification to perform services for United States employers in specialty occupations.  *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b).

23.    The statute defines "specialty occupation" to mean an occupation that requires the theoretical and practical application of a body of highly specialized knowledge, and the attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.  *See* 8 U.S.C. § 1184(i)(1)(A)-(B).

24.    The Department of Labor ("DOL") is charged with administering the H-1B program in terms of setting prevailing wage rates and enforcing employers' wage obligations in connection with the employment of skilled, temporary foreign workers in H-1B classification under 8 U.S.C. §§ 1101(a)(15)(H)(i)(b) and 1182(n).

25.    The statute requires employers to pay H-1B workers the higher of the actual or prevailing wage rate based on the best information available as of the time of filing a Labor Condition Application with DOL.  *See* 8 U.S.C. § 1182(n)(1)(A)(i).

26.    Since January 1998, the Department of Labor has used the Bureau of Labor Statistics' Occupational Employment Statistics Survey ("OES") to determine the

prevailing wage rates for H-1B occupations.  65 Fed. Reg. 80110, 80198 (Dec. 20, 2000).

27.     In 2004, Congress revised the prevailing wage system by requiring that where DOL uses, or makes available to employers, a governmental survey to determine the prevailing wage, such survey shall provide at least 4 levels of wages "commensurate with experience, education, and the level of supervision."  L-1B and H-1B Visa Reform Act, Public Law No. 108-447, Title IV, Subtitle B, § 423 (Dec. 8, 2004) (8 U.S.C. § 1182(p)(4)).  Before the statutory amendment, DOL only provided two wage levels when setting the prevailing wage rates for the H-1B program.  *See* 85 Fed. Reg. 63872, 63875 (Oct. 8, 2020).

28.     For over twenty years, DOL determined the level 1, 2, 3, and 4 wage rates based on the 17th percentile, the 34th percentile, the 50th percentile, and the 67th percentile, respectively, of the OES reported wage distribution for each occupation. 85 Fed. Reg. at 63875, 63893.

29.     Since 2010, DOL has used the Prevailing Wage Determination Policy Guidance (revised November 2009) to determine whether an employer's occupation in which it intends to employ an H-1B worker is classified as a 1, 2, 3, or 4 skill level for purposes of assigning a prevailing wage rate to the employer's occupation.  Under the guidance document, the skill level is determined based on

the job duties, education requirements, and experience requirements for the employer's occupation.  Exhibit A.

30.    Employers must obtain an approved Labor Condition Application ("LCA") from DOL as a pre-requisite for employing H-1B workers.  *See* 8 U.S.C. §1182(n).

31.    When filing an LCA, the employer must identify the specialty occupation position, the location of employment, and attest that it will comply with the required wage rate.  *See* 20 C.F.R. §§ 655.730(c)(4), 655.731(a).

32.    DOL determines the prevailing wage rate for the occupational classification in the LCA as of the time the employer files the LCA.  20 C.F.R. § 655.731(a)(2).

33.    An LCA may not be filed more than six months before the beginning date of intended employment.  *See* 20 C.F.R. § 655.730(b).  Moreover, an LCA, if approved by DOL, is valid for the period of employment stated in the LCA, but in no event longer than three years.  *See* 20 C.F.R. § 655.750(a).

34.    When certified, the LCA indicates the "prevailing wage" for a specific occupation in a particular geographic area.  Employers must pay H-1B workers the required wage rate for all work performed in the United States.  20 C.F.R. § 655.731(c)(1).

35.    After DOL approves an LCA, the employer may file a petition with the United States Citizenship and Immigration Services ("USCIS") to classify the

foreign worker as an H-1B nonimmigrant.  *See* 6 U.S.C. § 271(b)(5); 8 U.S.C.

§ 1184(c)(1); 8 C.F.R. § 214.2(h)(4)(iii)(B)(1).

36.     USCIS approves the employer's H-1B petition if the employer establishes

that its job requires the minimum of a bachelor's degree for entry into the position.

*See* 8 C.F.R. § 214.2(h)(4)(iii)(A).

37.     An approved H-1B petition allows the foreign national beneficiary to reside

in United States and work for the sponsoring employer in the position identified in

the petition.  *See* 8 C.F.R. §§ 214.2(h)(13)(i), (h)(18), 274a.12(b)(9).

## FACTUAL ALLEGATIONS

38.     On February 4, 2020, the Secretary of Health and Human Services declared

a public health emergency stemming from the spread of the novel coronavirus

("2019-nCoV").  85 Fed. Reg. 7316.

39.     To address the spread of 2019-nCoV, the governors of several states issued

emergency orders restricting or limiting business, commercial, and other social

activities.  *See, e.g, Friends of Devito v. Wolf*, 2020 Pa. LEXIS 1987, *2-11 (Pa.

2020) (discussing Governor Wolf's closure order); *South Bay United Pentecostal

Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring); Governor

Philip D. Murphy, Executive Order No. 107 (March 21, 2020), available at:

nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf.

40.    According to data from the Bureau of Labor Statistics, the general unemployment rate in the United States for all occupations reached 15 percent in April 2020.  Exhibit B.  However, the unemployment rate for computer occupations during that timeframe was only 2.8 percent.  Exhibit B.

41.    By September 2020, the general unemployment rate was down to 7.8 percent.  Exhibit C.  However, the unemployment rate for individuals aged twenty-five or older with a bachelor's degree or higher was much lower at 4.7 percent. Exhibit D.  During that same timeframe, the unemployment rate for computer occupations remained low at 3.5 percent.  Exhibit E.

42.    From February 2020 to August 2020, the overall demand for computing and information technology services rose due to consumer and commercial demands relating to restrictions arising from the 2019 nCoV pandemic.

43.    The demand for computer services and computer-related occupations remained stable or has risen during the 2019 nCoV pandemic because most computing and information technology services are able to be performed remotely or through telecommuting.

44.    According to USCIS, in fiscal years 2018 and 2019, over sixty-six percent of H-1B petitions were filed for computer-related occupations.  Exhibit F.

45.    According to DOL, in fiscal year 2019, at least thirty three percent of LCAs were filed for Software Developer occupations.  Exhibit G.

**DOL's Interim Final Rule**

46.     On October 8, 2020, DOL published, without prior notice or opportunity for public comment, an interim final rule (IFR) changing its method for calculating the prevailing wage rates in the H-1B program.  *See* 85 Fed. Reg. 63872.

47.     In the IFR, DOL altered the level 1 prevailing wage from the 17th percentile of the OES wage distribution to the fifth decile, or the 45th percentile.  85 Fed. Reg. at 63892, 63905.  Based on that upward adjustment, DOL increased the level 2 prevailing wage rate from 34th to the 62nd percentile.  It also increased the level 3 prevailing wage from the 50th to the 78th percentile.  DOL further increased the level 4 prevailing wage from the 67th percentile to the 95th percentile.  85 Fed. Reg. 63893, 63905.

48.     DOL based the new level 1 prevailing wage rate upward adjustment on the assumption that the wages paid to individuals with a master's degree represent the entry level wages for H-1B workers.  85 Fed. Reg. at 63889.  DOL used the master's degree benchmark as a proxy for entry level positions in the H-1B program despite the statute's defining specialty occupation as an occupation requiring a bachelor's degree as the minimum qualification for entry into the position.  *See* 8 U.S.C. § 1184(i).

49.     Based on data derived from DOL on Table 1 of the IFR, 85 Fed. Reg. at 63886, and from USCIS (Exhibit F), DOL's upward adjustment of prevailing wage

rates results in an overnight increase of 24.5 percent in wage rates on average for computer-related occupations.  However, the new prevailing wage methodology increases prevailing wage rates for some computer-related occupations by as much as forty-five percent, depending upon skill level and geographic location of employment.  Exhibit H.

50.     By way of illustrative example, the IFR increases the prevailing wage rates for Software Developer occupations (15-1132) in the Newark, New Jersey metropolitan statistical area as follows:

### Software Developers (15-1132)

| Level | Pre-IFR 2020 Wage | Post-IFR Wage | Increase |
|-------|-------------------|---------------|----------|
| 1 | $78,811 | $116,251 | 47.5% |
| 2 | $100,526 | $150,010 | 49.2% |
| 3 | $122,221 | $183,768 | 50.3% |
| 4 | $143,936 | $217,526 | 51.1% |

Exhibits I and J.

51.     DOL acknowledges that its new wage methodology is a significant departure from the agency's prior policy that was in place for over twenty years.  85 Fed. Reg. at 63893.  The agency also acknowledges that its new methodology likely results in higher costs to employers.  85 Fed. Reg. at 63894.  DOL further

estimates a total of $198.29 billion in transfer costs to employers over a ten-year

timeframe due to the new prevailing wage rule.  85 Fed. Reg. at 63908.

52.    Despite acknowledging the significant cost increase to employers and their

reliance on DOL's twenty-year old prevailing wage policy, the agency failed to

afford employers or the public with any advance notice or opportunity to comment

on the facts, the agency's reasoning, the economic implications, or the feasibility

or detrimental effects of the rule.

53.    Instead of allowing employers an opportunity to comment before finalizing

the new prevailing wage rule, DOL put the IFR went into effect immediately upon

publication on October 8, 2020.

54.    DOL attempts to justify its immediate increase in prevailing wage rates

based on the assumption that H-1B workers earn less than their domestic worker

counterparts.  85 Fed. Reg. at 63882.  However, none of the studies on which DOL

relies in support of its assumption include an analysis of the wages of workers who

are classified as H-1B workers in direct comparison with other workers.  None of

the studies DOL cites provide evidence supporting the claim that H-1B workers are

paid far below what their United States worker counterparts are paid.

55.    DOL acknowledges that the best way to determine whether workers who

hold H-1B status are paid less than U.S. workers is to compare H-1B workers with

similar U.S. workers.  85 Fed. Reg. at 63882.  However, DOL ignores readily

available research that conducts studies of H-1B wages using that methodology. Those studies show that workers holding H-1B status have generally higher earnings than comparable U.S. workers.

56.    DOL also attempts to justify an immediate increase in prevailing wage rates based on the assumption that occupations have higher wage rates where H-1B workers are generally not present in those occupations.  85 Fed. Reg. at 63883. However, the research DOL cites in support of that assumption either contains the exact opposite finding or does not address the issue directly.

57.    The studies DOL cites do not support the agency's assumptions and rather suggest that when companies are permitted to hire H-1B workers, they tend to hire more U.S. workers or that U.S. workers on average are better off in terms of increased wage rates or more available job opportunities.

58.    DOL fails to consider readily available empirical research showing that the H-1B program does not have an adverse impact on the domestic labor force.  DOL fails to consider empirical studies showing that the decrease in employment of H-1B workers correlates with a decrease in wages for domestic workers.

59.    DOL ignores readily available empirical research showing that when companies hire fewer H-1B workers, there tends to be a corresponding drop in employment of domestic workers.

60.    DOL ignores readily available empirical research showing that that when companies have a more difficult time hiring H-1B workers, those companies are more likely to offshore jobs or hire workers to perform work overseas.

61.    DOL fails to consider readily available empirical research showing the reduction in the employment of H-1B workers tends to have a corresponding negative impact on productivity and research and development in the United States.

62.    DOL deprived Plaintiffs and the public at large the opportunity to provide information, facts, data, and empirical research on the assumptions and reasoning DOL put forward in support of changing the prevailing wage rates without advance notice.

63.    As a result of DOL's flawed assessment of the studies it cited, and its failure to consider relevant facts, information, and empirical studies, the agency's analyses of the issues and its reasoning suffer from several fundamental defects.

64.    DOL attempts to justify altering the prevailing wage rates and imposing them without advance notice and opportunity to comment based on the supposed need to assist unemployed workers to regain full employment and avoid related wage scarring.  However, DOL's reasoning is factually flawed and conflicts with basic economic principles.

65.    DOL's reasoning in support of the need for an emergency rule is based on the unsupported assumption that H-1B workers are paid less than their domestic worker counterparts.

66.    DOL's strategy of assisting unemployed workers with reentering the workforce by raising wage rates in the H-1B program is based on outdated unemployment data.

67.    DOL's strategy of assisting unemployment workers with reentering the workforce by raising wage rates in the H-1B program targets the wrong category of occupations because those occupations typically employing H-1B workers have low very low unemployment rates in comparison to occupations not requiring a bachelor's degree.

68.    DOL's strategy of assisting unemployment workers with reentering the workforce by raising wage rates in the H-1B program will not prevent wage scarring for workers in occupations where unemployment rates are high because those unemployed workers do not have the skills necessary to enter the occupations typically employing H-1B workers.

69.    DOL's basic assumption that workers who are laid off due to the lack of need for their services should be paid the same wage rates they made before being laid off conflicts with basic economic theory.

70.     DOL acknowledges that the IFR may likely result in employers not hiring

foreign or domestic workers.  85 Fed. Reg. at 63905.  DOL related recognizes the

possibility that such an outcome would result in the reduced demand for labor with

a potential reduction in labor demand by 7.74 percent.  85 Fed. Reg. at 63908.

Despite acknowledging the possibility that the IRF will decrease labor demand,

DOL failed to consider how that decrease in demand would adversely affect the

economic conditions under the 2019-nCov pandemic.

71.     DOL failed to consider the negative effects to the economy distressed under

the 2019-nCov pandemic resulting from the agency's raising wage rates in the

H-1B program.

72.     DOL failed to consider the negative financial impact of employers' inability

to pass on the increased costs imposed by the IFR onto the employers' customers

and clients.

73.     In cases where employers may be able to pass on the increased costs

imposed by the IFR onto the employers' customers and clients, DOL failed to

consider the negative economic impacts of such transfer costs in light of the

economic conditions under the 2019-nCov pandemic.

74.     DOL failed to marshal sufficient facts in support of its claim that the IFR

must take immediate effect to avoid an exponential increase in LCA filings by

employers who would seek to avoid compliance with the new wage rules in the

event DOL published those rules in compliance with the required notice and comment procedures.

## The Harm to the ITServe Members and Plaintiffs

75.     All of ITServe's members employ foreign nationals in computer-related occupations under the H-1B program.

76.     DOL deprived ITServe and its members of the opportunity to provide information, facts, data, or empirical research relevant to the assumptions and reasoning DOL put forward in support of changing the prevailing wage rates without advance notice before the new wage rule went into effect.

77.     Each member of ITServe immediately faces increased costs in terms of increased wages and personnel expenses under the IFR for any LCAs the members file on or after October 8, 2020.

78.     ITServe's members are unable to absorb, without material disruption to their operations, the cost increase imposed on them under the IFR because of their commitments through long-term contracts or owing to an inability to continue operations in their current form in the United States under the burden of the IFR's increased prevailing wage obligations.

## Precision Technologies Corp.

79.     Precision is a leading full stack information technology company, which provides consulting services, application development, and mobility solutions.

80.    All of Precision's computer related occupations require at least a bachelor's degree in computer science, software engineering, information science, or a related field.

81.    Precision recruits for workers in the United States for its open computer-related occupations.  Precision is usually unable to locate a sufficient number of qualified United States workers to fill its computer-related occupations.

82.    To meet the demand of Precision's clients for information technology services, Precision employs skilled foreign national employees in computer-related positions under the H-1B visa program.  Precision currently employs fifty-two H-1B workers.

83.    Precision has several long-term contracts with its customers and clients to provide information technology consulting services.  Those contracts were entered into before the IFR went into effect on October 8, 2020.

84.    Before October 8, 2020, Precision filed LCAs for positions in computer-related occupations, including the Software Developer occupational classification (15-1132) and the Computer Occupations (15-1199), among others.

85.    Under the IFR, the wage rates for Precision's computer-related occupations will increase up to fifty percent, depending upon the occupational classification, skill level, and geographic location of employment.

86.    Based on those wage increases, Precision will be forced to operate at a loss because it cannot re-negotiate long term contracts and cannot pass on the increased cost to its clients.

87.    If the IFR remains in place, Precision may be required to lay off workers or it may need to move its operations overseas (or both).

## Iflowsoft Solutions Inc.

88.    Iflow is an information technology firm that provides services to a variety of businesses to provide robust technology solutions and optimize information technology productivity.

89.    All of Iflow's computer related positions require at least a bachelor's degree in a computer-related field.

90.    Iflow recruits for United States workers, but it has been unable to locate qualified domestic workers.

91.    To meet the demand of Iflow's clients for information technology services, the company employs skilled foreign national employees in computer-related positions under the H-1B visa program.  The company currently employs forty H-1B workers.

92.    Iflow has several long-term contracts with its customers and clients to provide information technology consulting services.  Those contracts were entered into before the IFR went into effect on October 8, 2020.

93.    Before October 8, 2020, Iflow filed LCAs for positions in computer-related occupations, including the Software Developer occupational classification (15-1132), among others.

94.    Under the IFR, the wage rates for Iflow's computer-related occupations will increase up to 24.5% percent or more, depending upon the occupational classification, skill level, and geographic location of employment.

95.    Based on those wage increases, Iflow will be forced to operate at a loss because it cannot re-negotiate long term contracts and cannot pass on the increased cost to its clients.

96.    If the IFR remains in place, Iflow will be forced to end its United States based operations in their current form.  Iflow will be required to lay off workers or it may need to move its operations overseas (or both).

**Smart Works, LLC**

97.    Smart Works offers a comprehensive range of information technology services, including custom software development, mobile application development, IT consulting, and implementation planning and execution.

98.    All of Smart Works' computer-related occupation positions require at least a bachelor's degree in Computer Science, Software Engineering, Information Science, or a related field.

99.    Smart Works routinely recruits in the United States for workers, but qualified domestic workers rarely respond to the company's advertisements.

100.    To meet the demand of Smart Works clients for information technology services, the company employs skilled foreign national employees in computer-related positions under the H-1B visa program.  The company currently employs sixty-four H 1B workers.

101.    Smart Works has several long-term contracts with its customers and clients to provide information technology consulting services.  Those contracts were entered into before the IFR went into effect on October 8, 2020.

102.    Before October 8, 2020, Smart Works filed LCAs for positions in computer-related occupations, including the Software Developer occupational classification (15-1132), among others.

103.    Under the IFR, the wage rates for Smart Works' computer-related occupations will increase up to forty-nine percent or more, depending upon the occupational classification, skill level, and geographic location of employment.

104.    Based on those wage increases, Smart Works will be forced to operate at a loss because it cannot re-negotiate long term contracts and cannot pass on the increased cost to its clients.

105.    If the IFR remains in place, Smart Works will be required to end its United States based operations in their current form.  Smart Works may be required to lay

off its United States workers or it may need to move its operations overseas (or both).

### NAM Info, Inc.

106.   NAM Info is a leading product/software development and talent management organization, focusing on key technologies in analytics, mobile and cloud computing.

107.   All of NAM's computer-related positions require at least a bachelor's degree in Computer Science, Software Engineering, Information Science, or a related field.

108.   NAM recruits in the United States for skilled workers for its computer and information technology positions, but qualified U.S. workers rarely respond to the company's advertisements.

109.   To meet the demand of NAM's clients for information technology services, the company employs skilled foreign national employees in computer-related positions under the H-1B visa program.  The company currently employs twenty-seven H-1B workers.

110.   NAM has several long-term contracts with its customers and clients to provide information technology consulting services.  Those contracts were entered into before the IFR went into effect on October 8, 2020.

111.   Before October 8, 2020, NAM filed LCAs for positions in computer-related occupations, including the Software Developer occupational classification (15-1132), among others.

112.   Under the IFR, the wage rates for NAM's computer-related occupations will increase up to fifty percent or more, depending upon the occupational classification, skill level, and geographic location of employment.

113.   NAM cannot pass the cost of the increased wage rates under the IFR onto its clients because the company is locked into long term contracts.  NAM will accordingly be forced to operate at a loss, furlough workers, or close its business.

114.   If the IFR remains in place, NAM may be required to end its United States based operations in their current form.  NAM will be required to lay off its United States workers or it may need to move its operations overseas (or both).

**Kolla Soft Inc.**

115.   Kolla Soft provides information technology services to small and mid-sized companies, and it provides computer consultants when the end client requires information technology staffing solutions.

116.   All of Kolla Soft's computer-related occupation positions require at least a bachelor's degree in computer science, engineering, or a related field.

117.   To meet the demand of Kolla Soft's clients for information technology services, the company employs skilled foreign national employees in computer-

related positions under the H-1B visa program.  The company currently employs fifty-four H 1B workers.

118.   Before October 8, 2020, Kolla Soft filed LCAs for positions in computer-related occupations, including the Software Developer classification (15-1132), among others.

119.   Under the IFR, the wage rates for Kolla Soft's computer-related occupations will increase up to twenty-six percent or more, depending upon the occupational classification, skill level, and geographic location of employment.

120.   Kolla Soft is not able to pass along the increased cost imposed by the prevailing wage rates under the IFR to the company's clients.  Based on those financial restrictions at the current time, if the IRF remains in effect, Kolla Soft will be required to lay off workers or close its business operations.

### Dots Technologies, Inc.

121.   Dots is an information technology services firm serving primarily a variety of Fortune 2000 companies by servicing operating systems and providing software development and project management services, among other things.

122.   All of Dots computer related occupation positions require at least a bachelor's degree in computer science or a related field.

123.   Dots routinely posts job advertisements to recruit for United States workers, but to meet the demand of Dots' clients for information technology services, the

company employs skilled foreign national employees in computer-related positions under the H-1B visa program. The company currently employs thirty-four H 1B workers.

124. Dots has several long-term contracts with its customers and clients to provide information technology consulting services. Those contracts were entered into before the IFR went into effect on October 8, 2020.

125. Before October 8, 2020, Dots filed LCAs for positions in computer-related occupations, including the Software Developer occupational classification (15-1132), among others.

126. Under the IFR, the wage rates for Dots' computer-related occupations will increase up to thirty to forty percent, depending upon the occupational classification, skill level, and geographic location of employment.

127. Based on the wage increases under the IFR, Dots is at risk of closing its business or laying off workers because it cannot re-negotiate long term contracts and cannot pass on the increased cost to its clients.

### Zenith Services Inc.

128. Zenith is an information technology consulting company that focuses on asset-based business solutions that solve execution gaps for end clients.

129. All of Zenith's computer related occupation positions require at least a bachelor's degree in computer science or a related field.

130.   Zenith recruits in the United States for workers, but to meet the demand of its clients for information technology services, the company employs skilled foreign national employees in computer-related positions under the H-1B visa program.  The company currently employs twenty-eight H-1B workers.

131.   Before October 8, 2020, Zenith filed LCAs for positions in computer-related occupations, including the Software Developer occupational classification (15-1132), among others.

132.   Under the IFR, the wage rates for Zenith's computer-related occupations will increase up to twenty-seven percent or more, depending upon the occupational classification, skill level, and geographic location of employment.

133.   Based on the wage increases under the IFR, Zenith will be forced to pass on those increased costs to its clients and customers.

## CAUSES OF ACTION

### COUNT I
### (Violation of Notice and Comment Procedures)

134.   Plaintiffs re-allege all allegations above as though restated herein.

135.   DOL's IFR is a final agency action because it is the consummation of the agency's decision-making processes from which legal consequence flow in terms of imposing new wage obligations on ITServe's members and the named Plaintiffs.

136.   DOL published the IFR without prior notice and opportunity for public comment as required under 5 U.S.C. § 553(b).

137.   DOL's IFR is adversely affecting ITServe's members and the named Plaintiffs because they were deprived of an opportunity to provide comments, data, or information to DOL before the agency published the IFR.

138.   DOL's IFR is adversely affecting ITServe's members and the named Plaintiffs because the IFR dramatically increases their costs and expenses in terms of increased wage obligations owed to H-1B workers under LCAs filed on or after October 8, 2020.

139.   DOL lacks the necessary factual and legal justification to invoke the good cause exception for avoiding the required notice and comment procedures because: (a) the agency's contention that H-1B workers are paid less than United States workers is not supported by the available economic data and empirical studies and is based on flawed reasoning; (b) the agency relied on outdated data to support its allegation of an emergency; (c) the agency failed to consider directly relevant data regarding the current and historically low unemployment rates for persons with bachelor's degrees; (d) the agency failed to consider directly relevant data regarding the current and historically low unemployment rates in computer-related occupations; (e) the agency's strategy of preventing wage scarring of unemployed workers conflicts with basic economic theory; and (f) the agency's strategy of increasing wage rates in the H-1B program will hinder the return of unemployed workers back to full employment.

140.   DOL lacks the necessary factual and legal justification to invoke the good cause exception for avoiding the required notice and comment procedures because the agency presented no evidence to support its contention that employers will be induced to file an increased number of LCAs based on fraud, misrepresentations, or bad faith, in an attempt to avoid paying new prevailing wage rates under a legally promulgated wage rule issued through the required notice and comment procedures.

141.   Because DOL lacks the necessary factual support to establish good cause for avoiding the required notice and comment procedures, the Court is authorized to set aside the agency's IFR as contrary to law or as issued without observance of procedures required by law.  *See* 5 U.S.C. § 706(2)(A), (D).

## COUNT II
### (Agency Action Contrary to Statute)

142.   Plaintiffs re-allege all allegations above as though restated herein.

143.   Congress established the minimum qualification for entry into the H-1B program as the attainment of a bachelor's degree in a specific specialty.  *See* 8 U.S.C. §1184(i).

144.   DOL based the new level 1 prevailing wage rate upward adjustment on the assumption that the wages paid to individuals with a master's degree represent the entry level wages for H-1B workers.  85 Fed. Reg. at 63889.

145.   DOL used the master's degree benchmark as a proxy for entry level positions in the H-1B program despite the statute's defining specialty occupation as an occupation requiring a bachelor's degree as the minimum qualification for entry into the position.  *See* 8 U.S.C. § 1184(i).

146.   DOL set the prevailing wage rates based on qualifications and educational standards inconsistent with the statutory criteria defining entry into the H-1B program at the level of a bachelor's degree.  *See* 8 U.S.C. § 1184(i).

147.   DOL improperly set the level 1 prevailing wage rates at the fifth decile or the 45th percentile of the OES wage distribution for each occupation based on criteria inconsistent with the statute.  DOL's improper setting of the level 1 prevailing wage rate renders its related adjustments to other three prevailing wage levels defective.

148.   Because DOL used a standard contrary to the statutory criteria for determining the minimum requirements for entry into the H-1B program, the Court is authorized to set aside the agency's defective decision as contrary to law.  *See* 5 U.S.C. § 706(2)(A).

## COUNT III
### (Agency Action Arbitrary and Capricious)

149.   Plaintiffs re-allege all allegations above as though restated herein.

150.   DOL's decision to revise the prevailing wage methodology for the H-1B program based on the proposition that the wages paid to H-1B workers are

generally below the wages paid to similarly situated United States workers is not supported by the facts or relevant empirical studies.

151.   DOL failed to consider empirical studies showing that the wages paid to H-1B workers are generally not below the wage paid to similarly situated United States workers.

152.   DOL failed to consider empirical studies showing that the employment of H-1B workers does not adversely affect the wages or working conditions of United States workers.

153.   DOL failed to consider empirical studies showing that the employment of H-1B workers generally helps with job creation, wage growth, and the investment in research and development.

154.   DOL failed to consider empirical studies showing that the lack of availability of H-1B workers has a deleterious effect on the economy in terms of job loss, off-shoring of jobs, or a decline in investments in the United States.

155.   DOL's decision to change the prevailing wage methodology under the IFR conflicts with basic economic theory.

156.   DOL's failure to consider directly relevant evidence regarding the employment of H-1B workers or the agency's failure to respond to directly relevant evidence renders the agency's decision to change the prevailing wage methodology under the IFR arbitrary and capricious.

157.   DOL's failure to consider relevant facts and pertinent empirical studies evidences the agency's failure to exercise sound judgment under the circumstances and negates its claim that it is exercising technical expertise.

158.   The Court is authorized to set aside DOL's prevailing wage methodology and prevailing wage rule under the IFR as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Plaintiffs, therefore, pray that this Court enter an order:

A.  Taking jurisdiction over the subject matter of this civil action and Plaintiffs' causes of action;

B.  Holding unlawful and setting aside as arbitrary and capricious, contrary to law, and contrary to procedures required by law, DOL's issuance of the IFR for failing to follow the required notice and comment procedures under 5 U.S.C. § 553;

C.  Holding unlawful and setting aside as not in accordance with the Immigration and Nationality Act, as amended, DOL's setting the level 1 prevailing wage rates under the IFR at the fifth decile of the OES distribution;

D.  Holding unlawful and setting aside as not in accordance with the Immigration and Nationality Act, as amended, the level 2, level 3, and level 4 prevailing wage rates under the IFR;

D.  Holding unlawful and setting aside as arbitrary and capricious DOL's decision to restructure the prevailing wage rates for the H-1B program based on the agency's failure to consider relevant data, facts, and empirical studies, and for failing to engage in reasoned decision making;

E.  Preliminarily and permanently enjoining DOL from implementing, applying, or enforcing the IFR or any of the prevailing wage methodologies or prevailing wage rates under the IFR as against Plaintiffs and any member of ITServe Alliance, Inc.;

F.  Awarding Plaintiffs attorney's fees and costs under the Equal Access to Justice Act; and,

G.  Granting all other relief that is necessary, just, or equitable.

## COUNSEL'S CERTIFICATION OF RELATED CASES

The agency action challenged in this civil action went into effect on October 8, 2020.  *See* 85 Fed. Reg. 63872.  As of the time of filing this complaint, to the best of counsel's knowledge, the matter in controversy in this civil action is not the subject of any other action pending in this court or any other court.  Nor is the matter in controversy in this civil action subject to any ongoing arbitration or administrative proceeding.  However, counsel has been informed that several other parties not related to the Plaintiffs in this case plan to challenge the Department of

Labor's interim final rule by filing a complaint in the United States District Court for the District of Columbia.

Dated:  October 16, 2020                    Respectfully submitted,

JONATHAN WASDEN
Wasden Banias LLC

BRADLEY B. BANIAS
Wasden Banias LLC

s/Geoffrey Forney
GEOFFREY FORNEY
NJ Attorney No. 036232006
Wasden Banias LLC
411 West Ellet Street
Philadelphia, PA 19119
202-615-8315/ geoff@wasdenbanias.com