NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ITSERVE ALLIANCE, INC., et al., | : | |
| | : | **Civil Action No. 20-14604 (SRC)** |
| Plaintiffs, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| EUGENE SCALIA, United States Secretary of Labor, et al., | : | |
| | : | |
| Defendants. | : | |

**CHESLER**, District Judge

     This matter comes before the Court upon Plaintiffs' motion for a preliminary injunction under Federal Rule of Civil Procedure 65(a) and 5 U.S.C. § 705. Defendants have opposed the motion and oral arguments were presented on November 24, 2020. The Court has considered the papers filed by the parties, as well as the parties' oral arguments. For the reasons discussed below, the Court will grant Plaintiffs' motion, thereby enjoining Defendants from enforcing the relevant regulation against Plaintiffs during the pendency of this civil action, or until the Court issues a final judgment on the matter.

### I.    BACKGROUND

     Under the Immigration and Nationality Act's ("INA") H-1B program, nonimmigrant aliens may be admitted to the United States as temporary skilled workers, to be employed by United States employers in certain specialty occupations. 8 U.S.C. § 1101(a)(15)(H)(i)(b). Under this statute, a "specialty occupation" is defined as a position that requires the use of highly specialized knowledge and the attainment of at least a bachelor's degree or its equivalent. 8

1

U.S.C. § 1184(i)(1)(A)-(B). In order to hire a skilled worker under this H-1B program

(hereinafter referred to by the Court as an "H-1B worker"), an employer must first file a Labor

Condition Application ("LCA") with the Department of Labor ("the Department"). Once the

Department certifies an LCA, the employer may then file a petition with the United States

Citizenship and Immigration Services ("USCIS") to classify the foreign worker as an H-1B

nonimmigrant.

      This statutory scheme also sets certain requirements for how these H-1B workers must be

compensated. Under this program, employers are required to pay H-1B workers the higher of the

actual or prevailing wage rate for the particular occupation, based on the best information

available as of the time of filing the LCA with the Department. The Department sets four levels

of prevailing wage rates for H-1B workers. For over fifteen years, the Department set the four

levels of prevailing wage rates based on the 17th percentile, the 34th percentile, the 50th

percentile, and the 67th percentile, respectively, of the Bureau of Labor Statistics' Occupational

Employment Statistics Survey ("OES") reported wage distribution for each occupation.

      Earlier this year, the spread of the novel coronavirus ("COVID-19") across the world led

the Secretary of Health and Human Services to declare a public health emergency. Then, on June

22, 2020, President Trump issued Proclamation 10052, which, subject to a few exceptions,

suspended the entry of all H-1B nonimmigrants, as well as certain other visa applicants. 85 Fed.

Reg. 38,263.[1] Further, Proclamation 10052 ordered that:

> The Secretary of Labor shall . . . as soon as practicable, and consistent with applicable
> law, consider promulgating regulations or take other appropriate action to ensure that the
> presence in the United States of aliens who have been admitted or otherwise provided a
> benefit, or who are seeking admission or a benefit, pursuant to . . . an H-1B

---

[1] In <u>Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Security</u>, No. 20-cv-04887-JSW, 2020 WL
5847503 (N.D. Cal. Oct. 1, 2020), the court subsequently issued a preliminary injunction barring
the government from enforcing Proclamation 10052 against the plaintiffs in that action.

> nonimmigrant visa do[] not disadvantage United States workers in violation of section 212(a)(5)(A) or (n)(1) of the INA.

85 Fed. Reg. 38,266. On October 8, 2020, in compliance with this directive by the President, the Department published an interim final rule ("IFR") "consistent with the aims of the Proclamation," entitled "Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States," which changed the prevailing wage rates for H-1B workers. 85 Fed. Reg. 63,899. This IFR significantly increased the prevailing wage rates by setting the four levels as the 45th percentile, the 62nd percentile, the 78th percentile, and the 95th percentile, respectively, of the surveyed OES wages. Further, the Department made the IFR effective immediately, without advance notice and comment. However, the Department did provide for a post-issuance comment period, to run from the date of the issuance of the IFR through November 9, 2020.

Soon after the IFR was issued, on October 16, 2020, Plaintiffs filed a civil action in this Court against Defendant Eugene Scalia, the Secretary of Labor for the United States Department of Labor and Defendant John Pallasch, the Assistant Secretary of Labor for the Employment and Training Administration, both in their official capacities. Plaintiffs' Complaint asserts three Counts, that the Department: (1) violated the notice and comment procedures, (2) acted contrary to a relevant statute, and (3) acted in a manner that was arbitrary and capricious. Plaintiffs are all United States information technology ("IT") and computer servicing companies that employ H-1B workers in computer occupations. Specifically, Plaintiffs include Plaintiff ITServe Alliance, Inc. ("ITServe"), a nonprofit corporation with over 1,250 IT companies as members, Plaintiff Dots Technologies, Inc. ("Dots"), Plaintiff Iflowsoft Solutions, Inc. ("Iflow"), Plaintiff Kolla Soft, Inc. ("Kolla Soft"), Plaintiff NAM Info, Inc. ("NAM"), Plaintiff Precision Technologies Corp. ("Precision"), Plaintiff Smart Works, LLC ("Smart Works"), and Plaintiff Zenith Services,

Inc. ("Zenith"). Three days after Plaintiffs first brought this action, they filed a motion for an order requiring Defendants to show cause why a preliminary injunction should not issue, pursuant to L. Civ. R. 65.1. On October 20, 2020, the Court denied this motion, based on its finding that Plaintiffs did not offer sufficient support demonstrating why emergency relief was appropriate. Plaintiffs then filed this Amended Motion for a Preliminary Injunction. Oral argument was heard on this motion on November 24, 2020.

## II.   DISCUSSION

### A.  Legal Standard

Plaintiffs bring this motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). In order to succeed on a motion for a preliminary injunction, the movant must establish  "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Under this test, the Court must first determine whether the movant meets "the threshold for the first two 'most critical' factors." Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." Id.

### B.  Plaintiffs' Likelihood of Success on the Merits

Beginning with the first factor needed to support the issuance of a preliminary injunction, Plaintiffs must show that they are likely to succeed on the merits. This standard "requires a showing significantly better than negligible but not necessarily more likely than not." Id. Plaintiffs point to two bases for why they are likely to succeed on the merits of their claim that

the IFR is invalid. First, Plaintiffs argue that the IFR is arbitrary and capricious. Second, Plaintiffs assert that the IFR is procedurally defective, as it was promulgated by the Department without an advance notice and comment period.

### 1.   Plaintiffs' Contention that the IFR is Arbitrary and Capricious

In their first point on the merits, Plaintiffs contend that the IFR is arbitrary and capricious because it fails to account for important evidence that is contrary to the Department's stated position. As support for its decision to raise the prevailing wage rates for H-1B workers, the Department pointed to evidence that suggests that H-1B workers are often paid less than their domestic counterparts, which can then lead to domestic workers receiving lower wages or fewer job opportunities. Plaintiffs, on the other hand, argue that the Department lacks substantial evidence to bolster this conclusion. In particular, Plaintiffs rely on their expert's report, which states that the studies cited by the Department are either inadequate or unreliable, and that, in fact, a large body of evidence points to the conclusion that H-1B workers are often paid higher wages than their domestic counterparts, causing the H-1B program to actually have a positive impact on the domestic labor force. The Court concludes that it need not decide whether or not Plaintiffs are likely to succeed on this issue, because it finds that Plaintiffs have demonstrated that they are likely to succeed on the merits of their second point – that the IFR is procedurally defective.

### 2.   Plaintiffs' Contention that the IFR is Procedurally Defective

As for their second contention on the merits, Plaintiffs assert that Defendants failed to follow the rulemaking procedures required under the Administrative Procedure Act ("APA"), making the IFR procedurally defective. Under the APA, when an agency puts forth a legislative rule, that is, a binding regulation based on a legislative function delegated to the agency by

Congress, it must comply with the APA's notice and comment procedure. <u>Marshall v. W. Union Tel. Co.</u>, 621 F.2d 1246, 1254 (3d Cir. 1980). This procedure requires that "[g]eneral notice of proposed rulemaking . . . be published in the Federal Register . . . [and that] [a]fter [the] notice required by this section, the agency . . . give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b)-(c). Here, Defendants concede that the IFR is a legislative rule that would ordinarily be subject to the rulemaking procedure set forth in the APA. Nevertheless, the Department chose to forego the notice and comment period before promulgating the IFR, arguing that it was excused from this procedural requirement under the "good cause" exception. This exception, also found in the APA, states that notice and comment is not needed "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The Department asserts two grounds in support of its argument that the "good cause" exception applied here – first, that the regular rulemaking procedure was impracticable, and second, that proceeding with advance notice and comment would have been contrary to the public interest.

Before analyzing the Department's purported bases for good cause, it is important to note that it is well-settled that the good cause exception is to be "'narrowly construed.'" <u>United States v. Reynolds</u>, 710 F.3d 498, 507 (3d Cir. 2013) (quoting <u>United States v. Cain</u>, 583 F.3d 408, 420 (6th Cir. 2009)). As such, "'[c]ircumstances justifying reliance on (the good cause) exception are indeed rare and will be accepted only after the court has examine(d) closely proffered rationales justifying the elimination of public procedures.'" <u>Nat. Res. Def. Council, Inc. v. U.S. EPA</u>, 683 F.2d 752, 764 (3d Cir. 1982) (quoting <u>Council of S. Mountains, Inc. v. Donovan</u>, 653 F.2d 573, 580 (D.C. Cir. 1981)).

Due to the narrow nature of the good cause exception, the D.C. Circuit has held that no deference is owed to an agency's legal conclusion that it properly invoked the good cause exception. See Sorenson Commc'ns Inc. v. FCC, 755 F.3d 702, 706 (D.C. Cir. 2014) (finding that it need not defer to the agency's conclusion that it satisfied the good cause exception, as "[d]eference to an agency's invocation of good cause . . . would conflict with [the] deliberate and careful treatment of the exception . . . ."). Similarly, while the Fourth and Sixth Circuits have not explicitly stated what standard ought to apply in this type of situation, the Third Circuit has noted that those circuits seem to use the *de novo* standard. See Reynolds, 710 F.3d at 502 (citing United States v. Gould, 568 F.3d 459, 469-470 (4th Cir. 2009) and Cain, 583 F.3d at 419-423) ([T]he Fourth and Sixth Circuits have not stated a standard [for determining whether an agency properly invoked the good cause exception,] but appear to use *de novo* review . . . ."). The Third Circuit itself has stated that its application of the "interpretive principle [that the good cause exception should be narrowly applied] generally suggests that *de novo* review is the correct standard for examining claims of good cause under the APA." Id. at 508. However, it also recognized that one of its previous decisions proposed a mixed standard, that is, that a court should:

> [R]eview *de novo* whether the agency's asserted reason for waiver of notice and comment constitutes good cause, as well as whether the established facts reveal justifiable reliance on the reason. But any factual determinations made by the agency to support its proffered reason are subject to arbitrary and capricious review.

Id. Nevertheless, the Third Circuit ultimately decided not to determine what standard of review applies in this context, as it found in that case that the government's assertion of good cause failed even under the most deferential standard. Id. at 509. Here too, the Court need not resolve this matter, as it finds that the Department's invocation of good cause does not pass muster even under the highly deferential arbitrary and capricious standard.

> i.      *Defendants' First Argument in Favor of Good Cause: Advance*
> *Notice and Comment was Impracticable Because of the COVID-19*
> *Pandemic*

The Court will now focus on the Department's first argument that it properly invoked the

good cause exception, that is, that having an advance notice and comment period would have

been impracticable. As the Department explained in the IFR, the determination of whether it was

impracticable for an agency to comply with the advance notice and comment procedure hinges

on whether the agency could not "'both follow section 553 and execute its statutory duties.'"

Nat. Res. Def. Council, Inc. v. Evans, 316 F.3d 904, 911 (9th Cir. 2003) (quoting Levesque v.

Block, 723 F.2d 175, 184 (1st Cir. 1983)). See also Kollett v. Harris, 619 F.2d 134, 145 (1st Cir.

1980) (quoting Nat'l Nutritional Foods Ass'n v. Kennedy, 572 F.2d 377, 385 (2d Cir. 1978))

("'Impracticable means a situation in which the due and required execution of the agency

functions would be unavoidably prevented by its undertaking public rule-making

proceedings.'").

In support of its contention that, had it proceeded through the normal notice and comment

process, it would have been "impracticable for [the Department] to fulfill its statutory mandate"

of protecting the domestic labor force, the Department argued that the COVID-19 pandemic

created an economic emergency, whereby many Americans were laid off, causing high

unemployment rates. 85 Fed. Reg. 63,898. Further, the Department asserted that, had it delayed

in promulgating the IFR, significant "wage scarring" would have resulted. 85 Fed. Reg. 63,899.

Wage scarring encapsulates the idea that people who remain unemployed for a long period of

time often are forced to ultimately accept employment at lower wages than they had previously

received. Nevertheless, the Department has failed to point to sufficient facts in support of its

argument that an economic emergency existed in this context that justified disregarding the APA's rulemaking procedure.

In the IFR, as well as the Defendants' brief, the Department attempts to analogize the current state of affairs to highly emergent situations in which prior courts found that good cause existed. Indeed, the Department appears to concede that there is a general consensus among the circuit courts that an agency's invocation of the good cause exception should only be upheld in emergency situations, or where following the regular rulemaking procedure would result in serious or real harm. 85 Fed. Reg. 63,898. See also Reynolds, 710 F.3d at 513 (applying the "serious harm" test to determine whether good cause existed for foregoing the notice and comment process); Jifry v. FAA, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (internal citations omitted) ("The [good cause] exception excuses notice and comment in emergency situations, or where delay could result in serious harm."); Evans, 316 F.3d at 911 (internal citations omitted) ("[N]otice and comment procedures should be waived only when 'delay would do real harm.' 'Emergencies, though not the only situations constituting good cause, are the most common.'"); U.S. Steel Corp. v. U.S. EPA, 595 F.2d 207, 214 (5th Cir. 1979) ("[The good cause exception] is an important safety valve to be used where delay would do real harm."). Nonetheless, it is abundantly clear that the purported impracticality at issue here in no way resembles the truly exigent or seriously harmful situations present in the cases cited by the Defendants.

Courts are hesitant to find that an emergency existed, or that a factual scenario posed a real risk of serious harm, and when they have, it has generally involved situations with imminent threats to national security, public safety, or the environment. See, e.g., Jifry, 370 F.3d at 1179 (finding that the good cause exception was met where there was an "'imminent hazard to aircraft, persons, and property with the United States,'" especially in the "aftermath of September 11,

2001"); Hawaii Helicopter Operators Ass'n v. FAA, 51 F.3d 212, 214 (9th Cir. 1995) (explaining that the FAA had good cause for "taking emergency action without waiting for public participation," as it was motivated by "its concern about the threat to public safety reflected in an increasing number of helicopter accidents"); Council of S. Mountains, 653 F.2d at 575, 581-82 (holding that the then-Secretary of Labor "had good cause to dispense with usual rulemaking procedures" as the case was of "life-saving importance," in that it involved dangers presented to miners in mine explosions). Cf. Mack Trucks, Inc. v. EPA, 682 F.3d 87, 93 (D.C. Cir. 2012) (finding that the impracticability exception did not apply where the IFR did "not stave off any imminent threat to the environment or safety or national security"). Rather than pointing to any imminent threats to national security, public safety, or the environment, the Defendants here have asserted possible fiscal harm. However, the only cases cited by Defendants as support for the idea that the danger of potential *economic* harm can satisfy the good cause exception are not factually comparable. In particular, those cases generally involved instances in which good cause was found because the agency's prior regulations or guidelines had been invalidated by a court order, and thus immediate promulgation of a new regulation was needed to prevent harm to the public in the interim. See, e.g., Mid-Tex Elec. Coop., Inc. v. FERC, 822 F.2d 1123, 1133-34 (D.C. Cir. 1987) (finding that the agency had good cause to create an interim rule without notice and comment, partially due to the fact that because portions of the prior rule were previously invalidated, the lack of a new rule for the time being would lead to "'regulatory confusion'" and "'irremedia[able] financial consequences'"); Am. Fed'n of Gov't Emps. v. Block, 655 F.2d 1153, 1157 (D.C. Cir. 1981) (holding that the good cause exception was satisfied because a previous preliminary injunction issued against the agency had made its prior guidelines "null and void[,]" and would have required the agency to rely on "antiquated guidelines" in the meantime).

While Defendants do reference one case in which a court found that good cause existed due to potential economic harm, even where the previous rule was not specifically invalidated by a court order, that case is also inapplicable here. In that case, <u>Nat'l Fed'n of Federal Emps. v. Devine</u>, 671 F.2d 607, 609 (D.C. Cir. 1982), the Office of Personnel Management ("OPM") decided to postpone "open season" for its Federal Employees Health Benefits ("FEHB") program, and instead issued an interim regulation without prior notice and comment. The OPM's decision was partially based on the fact that, due to delayed contract negotiations, substantial changes to insurance plans, and pending lawsuits that created uncertainty regarding certain aspects of the FEHB program, accurate information regarding the insurance plans was not yet available for distribution to employees. <u>Id.</u> at 609. Therefore, the court found that good cause existed, as continuing normally despite the unsettled insurance terms would have caused uncertainty for employees attempting to choose plans and would have "posed a serious threat to the financial stability of the benefit program." <u>Id.</u> at 611-12. As such, while there was no injunction in that case that invalidated the OPM's previous program, had the OPM not been allowed to invoke the good cause exception, it would have had to proceed with its open season with inaccurate and unsettled information, much like the parties in <u>Am. Fed'n of Gov't Emps.</u> would have had to rely on antiquated guidelines if they were required to comply with the ordinary rulemaking procedure. Here, unlike in the cases cited by the Department, there was not an absence of relevant guidelines that necessitated that the Department release the IFR effective immediately. The prior guidelines were still in effect and could have been relied upon during the required notice and comment period.

Furthermore, not only is the present case distinguishable from the case law referenced by the Department, but the facts relied upon by the Department also do not support its conclusion

11

that an economic crisis existed as to the H-1B program. There can be little doubt that the COVID-19 pandemic has created an economic crisis in this country and caused widespread unemployment. Indeed, in coming to the conclusion that an economic emergency existed which necessitated the immediate promulgation of the IFR, the Department pointed to the unemployment rates for the United States labor market *as a whole*. 85. Fed. Reg. 63,899.[2]  But that is simply an inadequate basis for concluding that such an emergency exists in the part of the labor market affected by the H-1B program – the part of the economy that the IFR is designed to impact. Even under the arbitrary and capricious standard of deference, the Department's reliance on the overall unemployment rates to show that an emergency existed was unwarranted. Those who have been primarily affected by lay-offs due to the COVID-19 pandemic, and the wage scarring that comes along with those lay-offs, are people in the service sector. See U.S. Bureau of Labor Statistics, *Unemployed Persons by Occupation and Sex* (Ex. G to Pls.' Br.); see also Ortega Report (Ex. B to Pls.' Br.), at 3; Zavodny Report (Ex. C to Pls.' Br.), at 15. Workers in service occupations are not qualified for H-1B positions, as they are not employed in "specialty occupations." 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8 U.S.C. § 1184(i)(1)(A)-(B). Thus, any changes to the prevailing wage rates for H-1B workers will not affect nor help those service workers chiefly affected by the current economic situation.  In Nat'l Ass'n of Mfrs., the court came to a similar conclusion. There, the court considered the validity of Presidential Proclamation 10052, which suspended the entry of all H-1B nonimmigrants, as well as certain other visa applicants, unless they qualified for an exception.  Nat'l Ass'n of Mfrs., 2020 WL 5847503, at *1. There too, the government argued that its position was proper based on the economic crisis caused by

---

[2] Additionally, Defendants' counsel at oral argument conceded that the Department focused on the general unemployment rates. Transcript of Oral Argument at 25-26, ITServe Alliance, Inc. v. Scalia (No. 20-14604).

the COVID-19 pandemic. Id. at *2.  In particular, the government argued that admitting H-1B

nonimmigrants and other particular visa applicants, would pose "'a risk of displacing and

disadvantaging United States workers during the current recovery.'" Id. (quoting 85 Fed. Reg.

38,263). Nevertheless, the court rejected that argument, finding that:

> [T]here remain[ed] a significant mismatch of facts regarding the unemployment caused
> by the proliferation of the pandemic and the classes of noncitizens who are barred by the
> Proclamation. The statistics regarding pandemic-related unemployment actually indicate
> that unemployment is concentrated in service occupations and that large number of job
> vacancies remain in the area most affected by the ban, computer operations which require
> high-skilled workers. These jobs are simply not fungible.

Id. at *13 (internal citations omitted).

Additionally, the data shows that the H-1B program is heavily dominated by employees

holding computer-related positions. Specifically, computer-related occupations comprised over

66% of approved H-1B petitions in 2019. USCIS, *Characteristics of H-1B Specialty Occupation

Workers* (Ex. H to Pls.' Br.), at 13. Those computer-related positions tend to have some of the

lowest unemployment rates of all occupations. For example, in September 2020, the overall

unemployment rate was approximately 7.9%, while the unemployment rate for those in

computer-related positions was only 3.5%. U.S. Bureau of Labor Statistics, *Civilian

Unemployment Rate* (Ex. E to Pls.' Br.); U.S. Bureau of Labor Statistics, *Unemployed Persons

by Occupation and Sex* (Ex. G to Pls.' Br.). Further, this statistic indicates that the pandemic did

not cause a significant increase in unemployment for those in computer occupations, as the

unemployment rate for those fields was at 3% in January 2020, before the pandemic had any

effect on the American economy. National Foundation for American Policy, *Employment Data

for Computer Occupations for January to September 2020* (Ex. D to Pls.' Br.), at 1.

Moreover, even for those H-1B workers that do not work in a computer-related

occupation, according to the statutory criteria, *all* H-1B workers must have at least a bachelor's

degree. In that respect too, the unemployment rates for H-1B workers are not representative of the labor force as a whole – as the unemployment rate for those with a bachelor's degree or higher is much lower than those without an advanced degree. For instance, in September 2020, the seasonally adjusted unemployment rates for those with less than a high school diploma was 10.6%. U.S. Bureau of Labor Statistics, *Employment Status of the Civilian Population 25 Years and Over by Educational Attainment* (Ex. F to Pls.' Br.). For those that graduated high school, but without any time at college, the rate was 9%, and for those with only some college experience or an associate degree, the rate was 8.1%. U.S. Bureau of Labor Statistics, *Employment Status of the Civilian Population 25 Years and Over by Educational Attainment* (Ex. F to Pls.' Br.).  However, for those with a bachelor's degree or higher, the unemployment rate was nearly half of those with even some college experience – standing at 4.8% for September 2020. U.S. Bureau of Labor Statistics, *Employment Status of the Civilian Population 25 Years and Over by Educational Attainment* (Ex. F to Pls.' Br.). These statistics indicate that by targeting a program that by its own terms only includes those with at least a bachelor's degree, the Department missed the mark and failed to actually address the economic issues faced by many Americans. In short, while as noted earlier, the pandemic has clearly created an emergency in the overall employment market, there is no evidence that an emergency sufficient to dispense with the requirement for notice and comment exists within the labor market that the IFR seeks to address. For these reasons, even under the arbitrary and capricious standard, Plaintiffs are likely to succeed in showing that no emergency existed in the context of the H-1B program, and therefore, that the Department's argument that it was impracticable to comply with the standard rulemaking procedure was insufficient.

14

ii.     *Defendants' Second Argument in Favor of Good Cause: Advance*
        *Notice and Comment Would Be Contrary to the Public Interest as*
        *it Would Cause Regulatory Evasion*

The Court will now turn to the Department's second argument – that it properly invoked

the good cause exception because advance notice and comment would have been contrary to the

public interest. To satisfy the "public interest" prong of the good cause exception, the

Department must argue that "the interest of the public would [have] be[en] defeated by any

requirement of advance notice." Util. Solid Waste Activities Group v. EPA, 236 F.3d 749, 755

(D.C. Cir. 2001) (quoting U.S. Department of Justice, Attorney General's Manual on the

Administrative Procedure Act 31 (1947)). "Good cause is found on this basis 'only in the rare

circumstances when ordinary procedures—generally presumed to serve the public interest—

would in fact harm that interest.'" N.C. Growers' Ass'n v. United Farm Workers, 702 F.3d 755,

767 (4th Cir. 2012) (quoting Mack Trucks, 682 F.3d at 95).

As the only basis for its argument that following the usual notice and comment process

would have been contrary to the public interest, the Department argued that advance notice of the

proposed rule would have led to evasion of the new regulation, as employers would have rushed

to file LCAs in an attempt to lock in lower wage rates before the new rates became effective.

With respect to this specific concern, while "agencies might frequently assert that someone will

take advantage of the situation if advance notice is given[,] . . . the exception is not to become an

all purpose escape-clause . . . ." Mobil Oil Corp. v. Dep't of Energy, 728 F.2d 1477, 1492

(Temp. Emer. Ct. App. 1983). Thus, for this argument to work, "the anticipated response must

involve a significant threat of serious damage to important public interests." Id. Nonetheless,

because this issue involves predictions on the part of government agencies, based on their expert

knowledge, a somewhat higher level of deference is required. Id. In particular, the Court will

consider whether "the agency explain[ed] the facts and policy concerns it relie[d] on and that, given these, [whether] a reasonable person [w]ould have made the judgment the agency did." Id.

In support of its claim that its concern about regulatory evasion was reasonable, the Department points to three price fixing cases where courts found that the government acted properly in bypassing the notice and comment period, as advance notice of the new price regulations would have caused parties to take advantage of the upcoming changes. However, the cases brought by the Department do not help its position. Rather, they actually highlight why the Department's position is inappropriate in this case. Indeed, it is telling that all three cases cited by the Department in which the courts found that a concern of regulatory evasion met the good cause standard were issued by the Temporary Emergency Court of Appeals, a court formed solely for the purposes of dealing with the then-emergent issue of setting prices during a serious period of inflation.

For example, both Nader v. Sawhill and Mobil Oil involved instances where a government agency put forth regulations regarding petroleum oil prices without advance notice and comment. In Nader v. Sawhill, the court found that the good cause exception was satisfied because the delayed implementation of a price increase regulation would have aggravated the current oil shortage, by incentivizing oil producers to "withhold[] crude oil from the market until such time as they could take advantage of the price increase." 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975). In holding this way, the court emphasized the emergency situation in which this case was decided, that is, that oil "shortages [were] beginning to be felt as a result of the (Arab) embargo and [that] even more critical shortages [were] expected in the near future . . . ." Id. Further, the court limited its decision, "stress[ing] categorically that [its] resolution of the procedural issues [t]herein [was] founded upon the unique circumstances in which this price

increase was formulated. Assuming less calamitous circumstances, [it] fully expect[ed] that any future decisions [would] take the utmost advantage of full and open public comment." Id. at 1069. Similarly, in Mobil Oil, the court held that there was good cause to forego advance notice and comment, as promulgating the new regulation in advance would have highlighted certain loopholes in the current regulations, likely leading parties to "take advantage" of the loophole and "'grandfather in' unequal cost[s] . . . through long-term contracts." 728 F.2d at 1491. There too, in determining that good cause was present, the court focused on the context in which this new regulation was created – under "emergency conditions [that] prompt[ed] the petroleum price legislation." Id. at 1492. As the court explained, the regulation was made during "a volatile time, not that far removed from the Arab oil embargo of fall 1973, and far distant from the relative stability in the oil market of 1979 or 1983." Id. In the third case relied upon by Defendants, DiRieux v. Five Smiths, Inc., an executive order was put forth pursuant to the Economic Stabilization Act of 1970, in which the President issued a price freeze, which applied to tickets to professional football games. 499 F.2d 1321, 1323-24 (Temp. Emer. Ct. App. 1974). Although the order was issued without advance notice and comment, the court found that good cause was present, as advance notice would have caused "a massive rush to raise prices . . . before the freeze deadline." Id. at 1332. There as well, in giving its reasoning for its decision, the court pointed to the exigent circumstances that were present, explaining that "[e]ach price increase would have generated further increases in a growing spiral of inflation." Id.

A review of these cases makes it clear that the matter at hand is simply not comparable to those cases. All three cases were decided by the Temporary Emergency Court of Appeals and all three involved regulations promulgated under the Economic Stabilization Act of 1970, a piece of legislation specifically created to stabilize prices during a time of inflation. Although most would

not dispute that this country is currently faced with a public health crisis, and even that the national economy *as a whole* is in crisis, as previously explained, Defendants have not shown that there is an economic crisis related to the H-1B program – and certainly not one comparable to the true emergencies seen in the cases cited by the Department.

Further, as Plaintiffs have argued, there is considerable evidence pointing to the fact that the Department's actions might instead lead to the exact problem that these other cases tried to avoid – a shortage of necessary products or services. Due to the social distancing measures put forth to battle the COVID-19 pandemic, the country has seen an increased demand for internet and computer services. Ortega Report (Ex. B to Pls.' Br.), at 4 & Table 4. See also National Foundation for American Policy, *Employment Data for Computer Occupations for January to September 2020* (Ex. D to Pls.' Br.), at 4 (explaining that there was an almost 5% increase in job vacancy postings in the most common computer occupations since May 2020). As many Americans have personally experienced, videoconferences and remote work have become the new norm, making access to effective computer services and products paramount. However, as Plaintiffs explain in their declarations, the Department's increase to the prevailing wage rates for H-1B workers, which was done without giving affected employers any time to prepare for this change, will likely cause many IT and computer servicing companies to have to either raise their costs or close their businesses entirely. These issues may then be passed on to consumers, by making it more expensive and difficult to attain these vital computer services. Ortega Report (Ex. B to Pls.' Br.), at 4-5.

Additionally, and perhaps even more importantly, accepting the Department's logic here would allow for the exception to completely overtake the rule. The Department's rationale here, that advance notice of the new prevailing wage rates would lead employers to rush to avoid the

regulation, is not limited to the current COVID-19 pandemic. Indeed, Defendants' counsel at oral argument agreed that, according to the Department, this same reasoning would apply whenever the Department would increase the prevailing wage rates, assuming that no facts drastically change making it so that evasion would not be possible. Transcript of Oral Argument at 33, ITServe Alliance, Inc. v. Scalia (No. 20-14604). As such, according to the Department, any time it wishes to increase the prevailing wage rates for the H-1B program, it should be able to do so without complying with the APA's notice and comment procedure. This type of argument is exactly what previous courts have cautioned against, when explaining that courts must "avoid the good cause exemption swallowing up notice and comment requirements . . . ." Reynolds, 710 F.3d at 514. See also Mack Trucks, 682 F.3d at 94 (quoting Tenn. Gas Pipeline Co. v. FERC, 969 F.2d 1141, 1145 (D.C. Cir. 1992)) (warning against allowing "'the good cause exception . . . [to] swallow the notice and comment rule'"); N.C. Growers' Ass'n, 702 F.3d at 766 (discussing the "crucial purpose of ensuring that the exceptions do not 'swallow the rule'"); Buschmann v. Schweiker, 676 F.2d 352, 357 (9th Cir. 1982) (internal citations omitted) ("[T]he good cause exception should be interpreted narrowly, so that the exception will not swallow the rule."). For these reasons, even under the deferential standard suggested by the court in Mobil Oil, the Court finds that Plaintiffs have demonstrated a high likelihood of success in showing that the Department's concern for regulatory evasion was not reasonable based on the facts present in this case, and thus that it failed to properly invoke the public interest prong of the good cause exception. Therefore, because Plaintiffs have proven that they are likely to succeed in proving that both of the Department's arguments in favor of good cause are insufficient, the Court

concludes that Plaintiffs have shown with a high likelihood of success that the IFR is

procedurally defective.[3]

### C.  Plaintiffs' Likelihood of Irreparable Harm Absent Preliminary Relief

Moving on to the second factor needed to support the issuance of a preliminary

injunction, Plaintiffs must establish that "irreparable injury is *likely* in the absence of an

injunction." <u>Winter</u>, 555 U.S. at 22. Plaintiffs have demonstrated two harms, one procedural, and

one economic.

First, Plaintiffs assert that their procedural right to advance notice and comment was

violated, depriving them of the protections afforded to them under the APA. Both Plaintiffs and

Defendants agree that a party experiences actionable harm when he is "depriv[ed] of a

procedural protection to which he is entitled." <u>Sugar Cane Growers Coop. of Fla. v. Veneman</u>,

289 F.3d 89, 94 (D.C. Cir. 2002); Pls.' Br. 35; Defs.' Opp'n Br. 35. As such, because Plaintiffs

are likely to succeed in showing that they were entitled to advance notice and comment here,

they are able to establish a procedural harm. Moreover, although the Department has explained

that the IFR was issued merely as an interim rule, with a post-issuance comment period, "after

which the Department [would] review the comments and modify the rule as appropriate," Defs.'

Opp'n Br. 10-11, this does not eliminate the significant procedural harm suffered by Plaintiffs.

As the Ninth Circuit explained in <u>California v. Azar</u>, "'[t]he key word in the title 'Interim Final

Rule' . . . is not interim, but *final*. 'Interim' refers only to the Rule's intended duration—not to its

---

[3] Defendants have also argued that, even if the Court finds that neither of the Department's justifications constitute good cause *alone*, the Court should "consider whether the 'combined effect'" of the two reasons suffices. Defs.' Opp'n Br. 22. Defendants, however, only summarily mentioned this concept and in no way explained how the Department's two bases for good cause somehow combine to create a proper invocation of good cause. Accordingly, the Court rejects this argument, and finds that Plaintiffs have still shown that they are likely to succeed in proving that the IFR is procedurally defective.

tentative nature.'" 911 F.3d 558, 580 (9th Cir. 2018) (quoting Career Coll. Ass'n v. Riley, 74

F.3d 1265, 1268 (D.C. Cir. 1996)). "Section 553 is designed to ensure that affected parties have

an opportunity to participate in and influence agency decision making at an early stage, when the

agency is more likely to give real consideration to alternative ideas." U.S. Steel Corp., 595 F.2d

at 214. Hence, "'[p]ermitting the submission of views after the effective date is no substitute for

the right of interested persons to make their views known to the agency in time to influence the

rule making process in a meaningful way. . . . '[It is] doubt[ful] . . . that the [agency

decisionmaker] would seriously consider . . . suggestions after the regulations are a fait

accompli." Id. at 214-15 (quoting City of New York v. Diamond, 379 F. Supp. 503, 517

(S.D.N.Y. 1974)). Here too, the fact that the Department allowed for a *post-issuance* comment

period does not make the IFR procedurally valid, and Plaintiffs can still establish a likelihood of

serious procedural harm.

Second, in addition to the procedural harm suffered by Plaintiffs, Plaintiff also assert

economic harm, as the change to the prevailing wage rates in the IFR significantly increases their

operation costs. Generally, "'a purely economic injury, compensable in money, cannot satisfy the

irreparable injury requirement . . . .'" Minard Run Oil Co. v. U.S. Forest Service, 670 F.3d 236,

255 (3d Cir. 2011) (quoting Frank's GMC Truck Ctr., Inc. v. General Motors Corp., 847 F.2d

100, 102 (3d Cir. 1988)). However, "an exception exists where the potential economic loss is so

great as to threaten the existence of the movant's business.'" Id. (quoting Vaqueria Tres

Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009)). As well, in instances where the

injured parties cannot recover monetary damages after the fact, even purely economic harm is

considered irreparable. For example, in California v. Azar, the Ninth Circuit held that certain

IFRs were procedurally defective for failing to comport with the APA's notice and comment

procedure. 911 F.3d at 579-580. Then, while the plaintiffs only asserted economic harm, the court found such harm "irreparable [t]here because the [plaintiffs] [would] not be able to recover monetary damages connected to the IFRs." Id. at 581 (citing 5 U.S.C. § 702, which limits relief for one wronged by an agency action to "relief other than money damages"). See also Ohio Oil Co. v. Conway, 279 U.S. 813, 814 (1929) (finding that, in a suit challenging a state tax statute, the movant had demonstrated certain and irreparable injury because "if the tax [were] paid and afterwards held invalid," there would be an "absence under the local law of any remedy enforceable by the [movant] . . . .").

Plaintiffs here have successfully shown that they are likely to suffer imminent irreparable economic harm absent preliminary relief. On average, the Department's change to the prevailing wage rates through the IFR caused an increase of 24.5% for wage rates for computer-related positions. Ortega Report (Ex. B to Pls.' Br.), at 4-5. Further, some Plaintiffs have established that the new IFR will increase their wage rates for H-1B workers by 50%. Mahajan Decl. (Ex. N to Pls.' Br.), at 3-4; Mula Decl. (Ex. O to Pls.' Br.), at 4; Khadakban Decl. (Ex. P to Pls.' Br.), at 4. Some of the Plaintiffs already expend over 60% of their total income toward paying employee salaries, making it nearly impossible for them to withstand this wage increase. Mahajan Decl. (Ex. N to Pls.' Br.), at 3; Khadakban Decl. (Ex. P to Pls.' Br.), at 3. Additionally, before the IFR was promulgated, many of the Plaintiffs entered into fixed long-term contracts based on the previous prevailing wage rate computations that had been in place for over fifteen years, now making it impossible for these Plaintiffs to pass along the increased wage rates to their clients. Mahajan Decl. (Ex. N to Pls.' Br.), at 2, 4; Mula Decl. (Ex. O to Pls.' Br.), at 2-4; Khadakban Decl. (Ex. P to Pls.' Br.), at 2, 4. Accordingly, these large increases will likely cause Plaintiffs to close their businesses or move their operations outside of the United States. Mahajan Decl. (Ex.

N to Pls.' Br.), at 4-5; Mula Decl. (Ex. O to Pls.' Br.), at 4; Khadakban Decl. (Ex. P to Pls.' Br.), at 4.

Further, while Defendants have argued that Plaintiffs will not suffer serious economic harm "within the few months that it will take to resolve this litigation," Defs.' Opp'n Br. 37, many, if not all, of the Plaintiffs will suffer the financial consequences of this change before a final decree could be issued. Indeed, as Plaintiffs pointed out, civil cases in this District have a median interval of 9.8 months from the time of filing until the final disposition of the case. Administrative Office of the U.S. Courts, *Table C-5: U.S. District Courts—Median Time Intervals from Filing to Disposition of Civil Cases Terminated, By District and method of Disposition, During the 12-Month Period Ending June 30, 2020* (Ex. U to Pls.' Reply Br.), at 1. This average timespan will undoubtfully increase even more because the COVID-19 pandemic has negatively impacted the speed of the discovery process and has forced courts to operate at a delayed pace. Additionally, the District is currently functioning with more than one-third of its active judgeships left vacant. See Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 203(d) (stating that the District of New Jersey has seventeen authorized permanent district judgeships); Administrative Office of the U.S. Courts, *Current Judicial Vacancies* (listing six judicial vacancies in the District of New Jersey).[4]

As well, some of the Plaintiffs have likely already been financially affected by the IFR. For example, Plaintiff Smart Works stated in its declaration dated October 19, 2020 that it needed to file three LCAs within two to three weeks of signing its declaration. Mula Decl. (Ex. O to Pls.' Br.), at 2. Similarly, Plaintiff Precision explained in its declaration dated October 15, 2020 that it would be required to file twelve LCAs within a month of signing its declaration.

---

[4] Available at: https://www.uscourts.gov/judges-judgeships/judicial-vacancies/current-judicial-vacancies.

Khadakban Decl. (Ex. P to Pls.' Br.), at 2. And while the harm caused to Plaintiffs by the IFR are economic, they are economic harms of the sort that are considered irreparable. Like in Minard Run Oil, where the Third Circuit found economic loss to be irreparable because the potential economic loss was so great as to threaten the movants with bankruptcy or closure of their businesses, here too, Plaintiffs have shown that, absent preliminary relief, they are likely to be forced to shut down their businesses entirely or to offshore their operations. This type of harm cannot be remedied once it has occurred. Similarly, even if Plaintiffs' businesses survive until a final decree is issued in this case, should it later be determined that the IFR was invalid, Plaintiffs will be unable to recoup any monetary damages for their losses after the fact. See 5 U.S.C. § 702 (limiting relief for one wronged by an agency action to "relief other than money damages"). As such, like in California v. Azar, where the Ninth Circuit found irreparable harm on very similar facts, Plaintiffs' monetary losses here would also be irreparable.

Finally, although Defendants point to certain cases that state that "courts *generally* 'will not base a finding of 'irreparable injury' on a procedural violation standing alone[,]'" Elk Assocs. Funding Corp. v. U.S. Small Bus. Admin., 858 F. Supp. 2d 1, 31 (D.D.C. 2012) (emphasis added) (quoting Am. Ass'n for Homecare v. Leavitt, No. 08-0992 (RMU), 2008 WL 2580217, at *5 (D.D.C. June 30, 2008)), in fact, many courts have found that a preliminary injunction may be issued solely on the grounds that a regulation was promulgated in a procedurally defective manner. See, e.g., California v. Azar, 911 F.3d at 574, 581 (affirming in relevant part the district court's grant of a preliminary injunction, which was issued because the government failed to comport with the notice and comment procedure); Tenn. Hospital Ass'n v. Azar, 908 F.3d 1029, 1046-47 (6th Cir. 2018) (finding that, because the regulation did not comply with the notice and comment rule, a permanent injunction was warranted until the

24

agency put forth a procedurally valid rule); <u>Nat'l Fam. Plan. & Reprod. Health Ass'n. v.</u>

<u>Sullivan</u>, 979 F.2d 227, 242 (D.C. Cir. 1992) (reinstating the district court's injunction, based

solely on the Circuit Court's conclusion that the APA's notice and comment procedure was not

followed); <u>Levesque</u>, 723 F.2d at 177 (affirming in relevant part the district court's injunction, as

the regulation failed to comply with the notice and comment rule without good cause); <u>N.</u>

<u>Mariana Islands v. United States</u>, 686 F. Supp. 2d 7, 17, 22 (D.D.C. 2009) (issuing a preliminary

injunction on the grounds that the plaintiff was likely to succeed on its claim that the agency did

not have good cause to bypass the notice and comment procedure set forth in the APA). For

these reasons, the Court concludes that Plaintiffs have established that they are likely to suffer

irreparable injury in the absence of preliminary relief.

### D. Whether the Balance of the Equities and the Public Interest Support Finding for Plaintiffs

The final two aspects that must be considered are the balance of the equities and whether

issuing an injunction is in the public interest. Where the government is the opposing party to a

preliminary injunction motion, the assessment of harm to the opposing party that occurs during

the balance of equities, and the public interest, are considered together. <u>Nken v. Holder</u>, 556 U.S.

418, 435 (2009).

Here, by promulgating the IFR without advance notice, the Department attempted to

balance its interest in protecting the domestic labor force, with the interests of employers and

others affected by changes to the H-1B program. Unfortunately, the Department did not succeed

in striking that proper balance here. If the Court were to grant a preliminary injunction, the only

possible harm to the government, and the public interest in general, would be a delay in the

effectiveness of the new prevailing wage rates for the H-1B program.  The Department has

argued that such a delay will prevent it from protecting domestic workers during the COVID-19

pandemic, and that a delay will allow employers to evade the new rates. However, as previously

explained, these arguments by the Department are likely to fail. The Department has not offered

sufficient factual support for its conclusion that there is an emergency relating to the H-1B

program, nor has it shown that its concern of regulatory evasion is reasonable in this context.

On the other hand, "[t]he public interest is served by compliance with the APA."

California v. Azar, 911 F.3d at 581.

> Section 553 was enacted to give the public an opportunity to participate in the rule-
> making process. It also enables the agency promulgating the rule to educate itself before
> establishing rules and procedures which have a substantial impact on those regulated. . . .
> [Overall, the APA's rulemaking procedures] 'were designed to assure fairness and mature
> consideration of rules of general application.'

Texaco, Inc. v. Fed. Power Comm'n, 412 F.2d 740, 744 (3d Cir. 1969) (quoting NLRB v.

Wyman-Gordon Co., 394 U.S. 759, 764 (1969)). See also Int'l Union, United Mine Workers of

Am. v. Mine Safety & Health Admin., 407 F.3d 1250, 1259 (D.C. Cir. 2005):

> [The APA's notice requirements] are designed (1) to ensure that agency regulations are
> tested via exposure to diverse public comment, (2) to ensure fairness to affected parties,
> and (3) to give affected parties an opportunity to develop evidence in the record to
> support their objections to the rule and thereby enhance the quality of judicial review.

By not allowing for a notice and comment period before publishing the IFR, the Department

denied the Plaintiffs, and the public in general, these important protections. Thus, while granting

Plaintiffs' request for a preliminary injunction will delay the effectiveness of the new regulation

– it may ultimately result in the creation of a better rule, one that reflects a nuanced and

intelligent decision, based on all of the relevant information made available to the Department.

As such, the Court finds that the balance of equities tip in favor of Plaintiffs, and that an

injunction is in the public interest. Therefore, because the four factors, taken together, lean in

favor of granting relief, the Court will grant Plaintiffs' motion for a preliminary injunction. The

Court's conclusion is bolstered by the decision in Chamber of Commerce v. U.S. Dep't of

Homeland Security, No. 20-cv-07331-JSW (N.D. Cal. Dec. 1, 2020), which invalidated the same

IFR at issue in this case for failure to provide an opportunity for advance notice and comment,

based on reasoning which, in many respects, is similar to this Court's analysis.

### E.  Whether Plaintiffs Must Post Security for the Preliminary Injunction

Federal Rule of Civil Procedure 65(c) states that a "court may issue a preliminary

injunction . . . only if the movant gives security in an amount that the court considers proper to

pay the costs and damages sustained by any party found to have been wrongfully enjoined . . . ."

Fed. R. Civ. P. 65(c). While the Third Circuit has held that at least some security is generally

required, an exception to the bond requirement exists "'when complying with the preliminary

injunction raises no risk of monetary loss to the defendant.'" Zambelli Fireworks Mfg. Co. v.

Wood, 592 F.3d 412, 426 (3d Cir. 2010) (quoting Hoxworth v. Blinder, Robinson & Co., 903

F.2d 186, 210 (3d Cir. 1990)). This exception applies here, as enjoining enforcement of the IFR

poses no risk of monetary loss to the Defendants. The Defendants, as well as the Department,

have no personal financial stake in this matter. The only people that might be financially affected

by the issuance of a preliminary injunction are those H-1B workers that would potentially

receive higher wages because of the increase to the prevailing wage rates. However, those H-1B

workers are not parties to this action. Plaintiffs, on the other hand, have shown that they are

likely to suffer significant financial harm absent preliminary relief, and forcing them to post

security in this context would serve no purpose except to further harm Plaintiffs. As such, the

Court finds in its discretion that it is not proper to impose any security for this preliminary

injunction.

**III.    CONCLUSION**

For the foregoing reasons, the Court finds that Plaintiffs have met the standard necessary for the issuance of a preliminary injunction. Therefore, Plaintiffs' motion for a preliminary injunction will be granted, thereby enjoining Defendants from enforcing the relevant regulation against Plaintiffs during the pendency of this civil action, or until the Court issues a final judgment on the matter.  An appropriate Order with be filed together with this Opinion.


   s/Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge


Dated: December 3, 2020